UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:22-CV-00085-GNS-HBB

RAEANN GONZALEZ                                        PLAINTIFF

v.

BRANDI TURNER et al.                                   DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 33). The motion is ripe for adjudication.

## I.      BACKGROUND

Plaintiff Raeann Gonzalez ("Gonzalez") brought this action against various medical staff workers at the Warren County Regional Jail ("WCRJ") in Bowling Green, Kentucky.  (Compl. ¶¶ 1-3, DN 1).  Gonzalez was held as a pre-trial detainee in the WCRJ from July 22 to August 9, 2021.  (Defs.' Mot. Summ. J. Ex. 1, DN 33-2; Defs.' Mot. Summ. J. Ex. 7, at 2, DN 33-8).  During this time, she was observed and treated by WCRJ medical staff for various medical conditions. (*See* Defs.' Mot. Summ. J. Ex. 4, DN 33-5).  Gonzalez asserts that she received inadequate medical care during her incarceration by Defendants Brandi Turner ("Turner"), Krystal Souders-Mutter ("Mutter"), Samantha Wilson ("Wilson"), and Shelly Weaver ("Weaver") (collectively, "Defendants"), all of whom were contracted to provide medical care to the WCRJ inmates through their employer, Southern Health Partners, Inc. ("SHP").  (Compl. ¶ 3; Turner Dep. 13:1-8, Dec. 4, 2023, DN 37; Mutter Dep. 14:14-15:10, Dec. 4, 2023, DN 38; Wilson Dep. 46:1-8; Nov. 17, 2023,

1

DN 39; Weaver Dep. 8:15-21, Nov. 28, 2023, DN 40).[1]  As employees of SHP, Defendants held the following positions during the events giving rise to this cause of action:  Turner was a registered nurse who "did intakes on every inmate that came into [the WCRJ]"; Mutter was the vice president for operations who oversaw "policy and procedure production, overview, budget, staffing, [and] quality assurance"; Wilson was the medical team administrator ("MTA") "responsible for running the medical staff at the [WCRJ]"; and Weaver was a travel nurse who covered "open shifts" at the WCRJ.  (Turner Dep. 13:1-8; Mutter Dep. 14:24-15:5; Wilson Dep. 46:1-4; Weaver Dep. 8:15-21).

Upon being admitted to the WCRJ on July 22, 2021, Gonzalez completed an intake form in which she indicated she suffered from dissociative identity disorder (i.e., multiple personality disorder) and physical gender dysphoria.  (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 2, at 1, DN 46-2).  She also indicated that she was taking the following medications:

1.    Estridol patches[:] 2 patches twice a week 1 mg delivery,
2.    Spironolactone[:] 300 mg 1 per day,
3.    Finasteride[:] .5 mg 1 per day,
4.    Truvada[:] 200-300 mg 1 per day,
5.    Tuzanadine[:] 1 per day [unknown] dosage,
6.    Moloxican[:] 200 mg every 6-8 hours (unsure on dosage and rate of dosage)

(Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 2, at 1).[2]  Gonzalez testified that she had available refills on all her prescriptions upon entering the WCRJ, and that she had received all her prescriptions from the local "Walgreens on the Bypass."  (Gonzalez Dep. 47:4-8, 53:16-22, June 27, 2023, DN 45).

---

[1] Gonzalez initially named three additional Defendants in her Complaint:  Laura Belcher, Alyssa Graves, and Jordan Grainger.  (Compl. ¶ 3).  Upon Plaintiff's joint motion to dismiss (DN 47), the Court dismissed all claims against these three Defendants with prejudice.  (Order 1, DN 48).

[2] Gonzalez was previously incarcerated at the WCRJ on May 13, 2021, and the intake form from that stay also indicates that she suffered from gender dysphoria and took hormone replacement medications.  (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 1, at 1, DN 46-1).

Gonzalez completed a medical history and physical, the results of which are reflected in her patient intake form. (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 3, DN 46-3 [hereinafter Gonzalez Medical Chart]). Wilson recalls being present for the history and physical. (Wilson Dep. 13:18-23). Weaver does not recall being present, despite her name being listed on the intake form. (Weaver Dep. 18:4-20).[3] During the intake, Gonzalez indicated that she needed her medication. (Wilson Dep. 40:10-17). Wilson, however, testified that she did not know what medication Gonzalez was on at the time she entered the WCRJ, as all inmate medications must be verified by either the treating physician or pharmacy. (Wilson Dep. 40:23-41:7 ("We can't just take [the inmate's] word. We have to have an active order and we have to have a verification from the pharmacy or their doctor.")). During the intake, Gonzalez reported methamphetamine use one week prior to being incarcerated. (Gonzalez Medical Chart 4). She also reported a previous suicide attempt in 2003. (Gonzalez Medical Chart 3). Wilson testified that Gonzalez appeared to be intoxicated during her intake, claiming she "could not conduct a conversation or even complete sentences." (Wilson Dep. 15:9-16:13). For this reason, Gonzalez was placed in a single cell for detox monitoring. (Wilson Dep. 15:9-21).[4]

On July 24, Turner called Walgreens attempting to verify Gonzalez's prescriptions. (Gonzalez Medical Chart 50). The chart notes indicate that Walgreens told Turner there were no active prescriptions for Gonzalez at that pharmacy other than estradiol patches, which were last

---

[3] Weaver has no recollection of interacting with Gonzalez, and believes that someone else signed into the laptop, using Weaver's credentials, to conduct the intake. (Weaver Dep. 18:15-20). Wilson does not recall who was on shift with her during Gonzalez's intake but stated she has no reason to believe it was not Weaver. (Wilson Dep. 25:5-13).

[4] Wilson also testified that another reason Gonzalez was placed in a single cell was because they "couldn't put her in either [a male or female dormitory] for her own safety." (Wilson Dep. 15:9-21). Regardless, Wilson indicated that her "concern was mostly about [Gonzalez's] intoxication." (Wilson Dep. 18:19-25).

filled on July 8, 2021, and had no refills available. (Gonzalez Medical Chart 50). To Turner's knowledge, Gonzalez did not arrive at the WCRJ with any estradiol patches, but Gonzalez testified she came to the WCRJ with two estradiol patches on her lower abdomen, which she showed to Weaver. (Turner Dep. 31:13-17; Gonzalez Dep. 45:12-25). Turner stated that, because there were no refills available, she did not contact SHP's medical provider to determine if she should continue administering the medication. (Turner Dep. 32:8-23). According to Turner, in order for Gonzalez to receive a refill on her prescription, Gonzalez would have needed to put in a "sick call request" to speak with SHP's medical provider. (Turner Dep. 34:19-35:6). Because no active prescriptions were listed for Gonzalez at Walgreens, Mutter indicated on her Medical Verification Form that no prescription medication was required. (Pl.'s Resp. Defs.' Mot. Summ J. Ex. 4, at 1, DN 46-4). Mutter does not recall interacting with Gonzalez in 2021 but acknowledged that she is the one who transmitted the verification form. (Mutter Dep. 31:1-11).

In the evening of July 24, Turner was called to Gonzalez's cell, as she was reporting face numbness and leg and pelvic pain. (Gonzalez Medical Chart 50). Turner offered to give Gonzalez Tylenol; however, Gonzalez stated this would not help and that she needed her medication. (Gonzalez Medical Chart 50). When Turner informed Gonzalez that the only prescription on record at Walgreens was estradiol, Gonzalez "became irate and started cussing and screaming[,]" telling Turner that information was incorrect. (Gonzalez Medical Chart 50). Gonzalez testified that her increased aggression was due to her lack of access to spironolactone. (Gonzalez Dep. 49:18-25). The medical chart indicates that Mutter attempted to verify Gonzalez's medications again on July 27, but that she was "currently unable to verify with the pharmacy." (Gonzalez Medical Chart 50).

SHP protocol provides that when inmates suffering from "long-term and/or serious chronic conditions" are not compliant with their medications, they must be "referred to the physician/provider for medication orders if needed." (Wilson Dep. 134:9-21). Wilson testified that gender dysphoria is not a serious chronic condition, but that she "would not know if it was long-term[,]" because the nurses did not know Gonzalez's length of care with the condition at the time of the intake. (Wilson Dep. 135: 5-8). Regardless, Wilson stated that the medical provider for the WCRJ was contacted regarding Gonzalez's condition, but that "he said he was not qualified for a transitioning patient" and told the nurses "to contact [Gonzalez's] pharmacy or the doctor . . . ." (Wilson Dep. 135:19-24). Defendants contend that, at this point, Gonzalez's pharmacy and doctor were already contacted "by the SHP nursing staff to no avail." (Defs.' Reply. Mot. Summ. J. 2, DN 49).

It is unclear whether Gonzalez's medical provider was actually contacted. Wilson claims that Turner contacted Gonzalez's medical provider and was told they were "no longer [] taking care of [Gonzalez], for non-compliance." (Wilson Dep. 137:14-21). Turner testified that she does not "recall sending a [request for prescriptions] to [Gonzalez's] provider." (Turner Dep. 45:16-22). There is no record that Gonzalez's medical provider was contacted by Defendants. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 6). Gonzalez was told at one point that she could have someone bring the prescriptions to her; however, the jail staff forbade her mother and girlfriend from bringing in the medications when they arrived at the facility. (Gonzalez Dep. 59:23-61:21).

Gonzalez's medical chart indicates that she was "resting quietly" on July 28 and August 1-2. (Gonzalez Medical Chart 50). On August 8, Gonzalez filed an inmate grievance form with the WCRJ for their "[c]ontinued denial of legally prescribed medications . . . for [hormone replacement therapy]." (Defs.' Mot. Summ. J. Ex. 7, at 1, DN 33-8). She also asserted that she

had been improperly placed on suicide watch despite having "no suicidal ideation at all and no indication of suicidal thoughts or actions." (Defs.' Mot. Summ. J. Ex. 7, at 1).[5]  Gonzalez was transferred from the WCRJ on August 9 pursuant to an outstanding fugitive warrant. (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 6, at 1 DN 46-6).

Gonzalez brought this action against Defendants in their individual capacities, claiming Defendants acted with deliberate indifference to her medical needs in violation of 42 U.S.C § 1983 ("Section 1983") under the Fourth, Eighth, and Fourteenth Amendments. (Compl ¶ 36). Defendants have moved for summary judgment. (Defs.' Mot. Summ. J., DN 33).

## II.    **JURISDICTION**

The Court has subject-matter jurisdiction because a federal question is presented. *See* 28 U.S.C. § 1331.

## III.    **STANDARD OF REVIEW**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party moving for summary judgment may satisfy its burden [of] show[ing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'" *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Similarly, the movant may

---

[5] Gonzalez's medical chart indicates that she was "express[ing] thoughts of [suicidal ideation]" on July 22 and was placed on suicide watch. (Gonzalez Medical Chart 33, 60). Weaver and Turner also charted that Gonzalez was placed back on suicide watch from July 26-29 and again August 2-3. (Gonzalez Medical Chart 20-22).

meet its burden by offering evidence negating an essential element of the non-moving party's claim. *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). "The mere existence of a scintilla of evidence in support of the [moving party's] position [is] [] insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

### A.   Motion for Summary Judgment

#### 1.   *Deliberate Indifference Standard*

Gonzalez brings this action under Section 1983, asserting that Defendants acted with deliberate indifference concerning her medical care. (Compl. ¶¶ 34, 40). "Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Johnson v. Gibson*, No. 4:19-CV-P174-JHM, 2021 WL 886230, at *3 (W.D. Ky. Mar. 9, 2021) (citing *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001)). Specifically, Gonzalez claims Defendants violated her constitutional rights under the Fourth, Eighth, and Fourteenth Amendments. (Compl. ¶¶ 36-40). As both parties correctly state, Gonzalez was not a convicted inmate when she was incarcerated; rather, she was a pre-trial detainee. (Defs.'

Mem. Supp. Mot. Summ. J. 1, DN 33-1; Pl.'s Resp. Defs.' Mot. Summ. J. 1, DN 46). The Supreme Court has delineated a distinction between the rights of pre-trial detainees and sentenced prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." (citations omitted)). Under the Fourth Amendment, the Supreme Court has held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. Gonzalez does not provide allegations specifying how her incarceration or condition of confinement was unlawful under the Fourth Amendment. Instead, she claims that "Defendants' conduct was a violation of [Gonzalez's] right not to be subjected to cruel and unusual punishment under the 8th[] and 14th Amendments to the United States Constitution in violation of [Section 1983]." (Compl. ¶ 40). Therefore, the Court will not consider a Fourth Amendment violation under Section 1983 and will instead focus its analysis on the Eighth and Fourteenth Amendments.

Although "[t]he Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, [] where that claim is asserted on behalf of a pretrial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Winkler v. Madison Cnty.*, 893 F.3d 877 (6th Cir. 2018) (citation omitted). The Supreme Court has found that "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) (citation omitted). Because Gonzalez was a pre-trial detainee and not a convicted inmate, the proper analysis falls under the Due Process Clause of the Fourteenth Amendment. (Defs.' Mem. Supp. Mot. Summ. J. 1; Pl.'s Resp. Defs.' Mot. Summ. J. 1). Although the Sixth Circuit has

"historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric[,]' this analysis was modified by the Supreme Court's ruling in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Richmond v. Huq*, 885 F.3d 928, 937, 938 n.3 (6th Cir. 2018); *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) ("Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable.").

In *Kingsley*, the Supreme Court modified the subjective component of Section 1983 excessive force claims brought by pretrial detainees under the Fourteenth Amendment. *Kingsley*, 576 U.S. at 402. Similar to claim of excessive force, "[a] deliberate-indifference claim under the Eighth Amendment has an objective and a subjective component." *Brawner*, 14 F.4th at 591. The Sixth Circuit has extended the holding in *Kingsley*, modifying the subjective component of the deliberate indifference test for pre-trial detainees bringing Section 1983 claims under the Fourteenth Amendment. *See id.* at 596-97. Thus, the test for deliberate indifference to a pre-trial detainee's medical needs under the Fourteenth Amendment contains (1) an objective component, which mirrors the objective test under the Eighth Amendment, and (2) a modified subjective component. *Id.* at 591, 596.

To meet the objective test, "a plaintiff must show that the medical need is 'sufficiently serious.'" *Id.* at 591 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The modified subjective test is not as straightforward; however, the Sixth Circuit provides guidance:

> Mere negligence is insufficient. A defendant must have not only acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." . . . . A pretrial detainee must prove "more than negligence but less than subjective intent— something akin to reckless disregard."

*Id.* at 596 (citations omitted).  The court in the *Brawner* then summarized the new standard:

> To meet [the] burden to show that [the medical provider] violated [the plaintiff's] constitutional right to adequate medical care, [the plaintiff] need[s] to present evidence from which a reasonable jury could find (1) that [the plaintiff] had an objectively serious medical need; and (2) that [the medical provider's] action (or lack of action) was intentional (not accidental) and [] either (a) acted intentionally to ignore [the plaintiff's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the plaintiff], even though a reasonable official in [the medical provider's] position would have known that the serious medical need posed an excessive risk to [the plaintiff's] health or safety.

*Id.* at 597.

This Court has cautioned against conflating a Section 1983 claim under the Fourteenth Amendment with a claim that is more appropriately brought as a state tort action.  *See Browder v. Hopkins Cnty.*, No. 4:22-CV-00065-JHM, 2024 WL 733646, at *3 (W.D. Ky. Feb. 22, 2024) ("Where 'a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'"  (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976))).  Similarly, a sister court noted that "*Brawner* did not change the principle that mere medical negligence, nor a disagreement between treater and patient as to the better course of treatment, does not equate to a constitutional violation[] under . . . the Fourteenth Amendment." *Vontz v. Hotaling*, No. 2:19-CV-12735, 2023 WL 2881350, at *6 (E.D. Mich. Mar. 6, 2023) (citing *Brawner*, 14 F.4th at 596).  With this in mind, the Court now analyzes whether any Defendant violated Gonzalez's Fourteenth Amendment rights under the post-*Brawner* framework.

### 2.    *Liability under Section 1983*

#### a.    **Serious Medical Need**

The first step in analyzing whether a Defendant acted with deliberate indifference is determining if Gonzalez had an "objectively serious medical need."  *Brawner*, 14 F.4th at 597.  A

serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015) (citation omitted). Plaintiff argues she was diagnosed with gender dysphoria, which she correctly points out has been recognized as a serious medical condition by the Sixth Circuit. (Pl.'s Resp. Defs.' Mot. Summ. J. 11); *see Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 540 (N.D. Ohio 2020) (citing *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401, 1997 WL 34677, at *3 (6th Cir. 1997)). In *Murray*, the Sixth Circuit held that "a complete refusal by prison officials to provide [an] [inmate] with any treatment [for gender dysphoria] at all would state an Eighth Amendment claim for deliberate indifference to medical needs." *Murray*, 1997 WL 34677, at *3 (citation omitted). Defendants do not dispute Gonzalez's gender dysphoria diagnosis, and the evidence in the record suggests they were aware of the diagnosis by reviewing Gonzalez's indicated medical history. (Inmate Intake Questionnaire 1, DN 46-2; Gonzalez Medical Chart 1, 9, 11, 17, 51-52; Inmate Medical Verification Form 1, DN 46-4). Therefore, the first prong of the *Brawner* test is satisfied, as Plaintiff has demonstrated she had a serious medical need during her incarceration.

### b.    Intentional and/or Reckless Conduct

To meet the second prong of the *Brawner* test, Gonzalez must demonstrate that a reasonable jury could find that (1) the Defendant's "action (or lack of action) was intentional (not accidental)" and (2) the Defendant "either (a) acted intentionally to ignore [Gonzalez's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Gonzalez] . . . ." *Brawner*, 14 F.4th at 597. Defendants argue that "[Gonzalez] has not and cannot produce any evidence which would indicate that they 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed' or that they 'knew, or should have

known, that the condition posed an excessive risk to health or safety.'" (Defs.' Mem. Supp. Mot. Summ. J. 6 (quoting *Brawner*, 14 F.4th at 596-97)). In response, Gonzalez asserts that the "complete lack of follow-up by Defendants to get the care that [she] required" constitutes reckless disregard. (Pl.'s Resp. Defs.' Mot. Summ. J. 14-15). Defendants correctly note that there is no evidence in the record that indicates either an intent to ignore or a reckless failure to act reasonably. The actions of each Defendant are analyzed below.

### i.  Turner

Turner provided care to Gonzalez on July 24 by (1) tending to Gonzalez in her cell, offering her Tylenol and (2) calling Walgreens in an attempt to verify Gonzalez's prescriptions. (Gonzalez Medical Chart 50). Turner also monitored Gonzalez from July 27-29 and August 2-3, while Gonzalez was on detox and suicide watch. (Gonzalez Medical Chart 21-22). During this time, Turner charted several times that Gonzalez was "relaxed", "quiet", or "appeared to be sleeping." (Gonzalez Medical Chart 21-22). Gonzalez effectively argues that because she was asking for her medications while demonstrating that she was in pain on July 24, Turner should have done more to ensure Gonzalez received her medications. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 4-6). She further asserts that "a reasonable jury could determine that Turner . . . believed that Gonzalez was compliant with her estradiol and made no attempt to contact her provider . . ." (Pl.'s Resp. Defs.' Mot. Summ. J. 6). It is true Turner did not contact the SHP provider; however, Gonzalez acknowledged that this lack of action was due to Walgreens's indication that there were no refills remaining for the estradiol patches. (Turner Dep. 32:17-23; Pl.'s Resp. Defs.' Mot. Summ. J. 4).

Gonzalez also contends that "[n]ormally, prescriptions would be automatically continued if they were verified to be within thirty days of the fill date, as Turner admits in her charting." (Pl.'s Resp. Defs.' Mot. Summ. J. 4). There appears to be an error in this attribution, as Gonzalez

cites to Weaver's deposition in making this assertion—not Turner's.  (Pl.'s Resp. Defs.' Mot. Summ. J. 4 (citing Weaver Dep. 47)).  Even still, it is difficult to discern admission of such a broad-sweeping policy from Weaver's language.  Weaver indicated that she would not "necessarily" need to get approval from the provider to continue administering estradiol patches, "if [they are] able to verify that the script was active." (Weaver Dep. 48:4-13).  It is not clear from the record that Turner had knowledge the estradiol patches were "active" based upon her conversation with Walgreens, only that "[the patches were] consistently prescribed, [but] there were no refills given." (Turner Dep. 30:21-25).[6]  Regardless, even if Turner failed to comply with SHP policy, the Sixth Circuit has stated that a nurse's "failure to follow policy alone is insufficient to support a claim for deliberate indifference." *Mercer v. Athens Cnty.*, 72 F.4th 152, 161 (6th Cir. 2023) (citations omitted).  There must be "'more' in [the] record that pushes [a nurse's] conduct beyond the level of negligence to deliberate indifference." *Howell v. NaphCare, Inc.*, 67 F.4th 302 (6th Cir. 2023) (quoting *Griffith v. Franklin Cnty.*, 975 F.3d 554, 570-71 (6th Cir. 2020)).

Based upon these facts, a reasonable jury could not find that Turner acted with deliberate indifference towards Gonzalez's medical needs.  Gonzalez has provided no support that Turner's actions constitute "intentional ignore[ing]" or "reckless[] fail[ure] . . . to mitigate the risk[,]" as required under *Brawner*.  *Brawner*, 14 F.4th at 597.  Gonzalez argues that a jury could find that Turner "never even attempted to verify Gonzalez's medication and instead completely ignored her medical needs . . . akin to no treatment at all . . . ." (Pl.'s Resp. Defs.' Mot. Summ. J. 13).  This distinction between inadequate versus no treatment is important, as the Sixth Circuit has stated

---

[6] Turner testified that Walgreens was contacted and stated no refills were available for Gonzalez's prescriptions.  (Turner Dep. 29:1-31:12).  There is no citation to any evidence that this information was incorrect or contradicted by Walgreens's records.  Gonzalez testified that Walgreens also informed her girlfriend, Jennifer, that there were no active prescriptions for Gonzalez at that pharmacy.  (Gonzalez Dep. 64:3-10).

that "where medical care is merely inadequate, this Court is 'generally reluctant to second guess medical judgments,'" but that "treatment may be constitutionally impermissible when it is 'so woefully inadequate as to amount to no treatment at all.'"  *Richmond*, 885 F.3d at 939 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  In the current case, Turner attempted to verify Gonzalez's prescriptions with Walgreens, offered her medicine for her pain, and continued to monitor her condition.  (Gonzalez Medical Chart 21-22, 50).  "No treatment at all" is an inaccurate characterization of Gonzalez's claim against Turner, which instead reflects a claim for inadequate treatment.  Regarding a Section 1983 claim for deliberate indifference, the Sixth Circuit implores hesitancy in second-guessing medical judgments.  *See Richmond*, 885 F.3d at 939 (quoting *Alspaugh v. McConnell*, 643 F.3d at 169).

The record reflects that Turner did attempt to provide care to Gonzalez.  This care may have been inadequate, but its potential inadequacy does not amount to the reckless standard necessary for Gonzalez's Section 1983 claim.  *See Browder*, 2024 WL 733646, at *3 ("[F]ederal courts are generally reluctant to . . . constitutionalize claims which sound in state tort law." (internal quotation marks omitted) (quoting *Westlake*, 537 F.2d at 860 n.5)).  Turner's motion for summary judgment is granted.

### ii.     **Mutter**

Mutter did not have significant involvement in the treatment of Gonzalez, and instead was primarily responsible for transmitting "the U.S. Corrections Inmate Medical Verification Form that listed Gonzalez as having no prescriptions."  (Pl.'s Resp. Defs.' Mot. Summ. J. 18).  Indeed, there is nothing to indicate that Mutter interacted with Gonzalez directly; instead, the medical chart states only that Mutter attempted unsuccessfully to verify the prescription with Walgreens on July 27.  (Gonzalez Medical Chart 50).  Contrary to Gonzalez's contention, there is no evidence to

suggest that Mutter "clearly ignored Plaintiff's medical diagnosis and need for treatment." (Pl.'s Resp. Defs.' Mot. Summ. J. 18). Gonzalez posits that Mutter incorrectly indicated that no prescription medication was required on the Medical Verification Form, but Mutter has clarified that "if there are no refills for the patient, then [the medications] wouldn't have been current prescriptions." (Mutter Dep. 33:9-17). Therefore, Mutter's indication on the form that there were no prescriptions does not appear to be inaccurate.

Gonzalez also claims that Mutter "did not think to follow up to ensure that Gonzalez received her prescriptions for her obvious medical diagnosis . . . ." (Pl.'s Resp. Defs.' Mot. Summ. J. 18). Even if Gonzalez could demonstrate that it was SHP policy for Mutter to follow up on Gonzalez's medications after reviewing the form, the mere failure to follow a policy is insufficient to demonstrate deliberate indifference. *See Mercer*, 72 F.4th at 161 (citations omitted). Similar to Turner, this alleged conduct is much more akin to a claim for medical negligence and not a violation of one's Fourteenth Amendment rights. Gonzalez has not provided any evidence showing that Mutter's lack of follow-up constitutes deliberate indifference. The fact that Mutter never had contact with Gonzalez is also noteworthy: the Sixth Circuit has found that a nurse who had minimal contact with an inmate was not deliberately indifferent because she "did not see [the inmate's] demeanor . . . or hear his complaints that would have tipped off a reasonable medical professional that he was experiencing a medical crisis." *Howell*, 67 F.4th at 315. Here, there are no facts to suggest that Mutter, in her tasks of calling Gonzalez's pharmacy and transmitting her Medical Verification Form, had reason to believe Gonzalez was in need of serious medical intervention. The Court, therefore, grants Mutter's motion for summary judgment.

### iii.     Wilson

Gonzalez's claim against Wilson mirrors her allegations against Turner.  Gonzalez states that "Mutter, Turner, and Wilson all failed to follow WCRJ/SHP procedures in notifying the physician IF they were unable to verify medications, . . . failed to notify the provider to ensure that provider could follow up with treatment, and failed to ascertain if Gonzalez had been compliant with her medication."  (Pl.'s Resp. Defs.' Mot. Summ. J. 17).   In contrast, the evidence demonstrates that multiple attempts were made to verify Gonzalez's prescriptions with Walgreens. (Gonzalez Medical Chart 50).   Additionally, Wilson has testified that, to her knowledge, Gonzalez's medical provider was contacted, but that Turner told her that the provider was no longer treating Gonzalez.  (Wilson Dep. 137:14-21).   As mentioned previously, it is not clear whether this medical provider was actually contacted.  (*See* Turner Dep. 45:16-22).  Regardless, Wilson was told that the provider had been contacted, and while this understanding may have been erroneous it does not amount to reckless disregard.[7]  *See Brawner*, 14 F.4th at 596 ("Mere negligence is insufficient.  A defendant must have not only acted deliberately (not accidentally),

---

[7] Similar to Walgreens, there is no citation to any evidence from Gonzalez's medical provider contradicting Wilson's understanding that the physician was no longer treating Gonzalez. Gonzalez argues that "in reviewing Gonzalez's Medical Chart, there is no entry whatsoever of attempts to contact any provider."  (Pl.'s Resp. Defs.' Mot. Summ. J. 7).  This statement coincides with the fact that Turner does not recall sending a request for prescription information to any of Gonzalez's providers.  (Turner Dep. 45:16-22).  Regardless, Gonzalez does not provide evidence from her medical provider to refute Wilson's understanding at the time.  Gonzalez did testify that her girlfriend, Jennifer, contacted Gonzalez's provider as was told "that he had sent the medications to Walgreens and that the medication prescriptions were current . . ." (Gonzalez Dep. 63:12-17).  The Court will not consider this testimony, as "[t]rial courts generally may not consider inadmissible hearsay on summary judgment."  *Branscumb v. Horizon Bank*, No. 24-1357, 2025 WL 48106, at *2 (6th Cir. Jan. 8, 2025) (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)).  Even if Gonzalez could provide evidence at trial that she was an active patient of the medical provider, this would not indicate that Wilson acted with deliberate indifference—it would merely show that Wilson's information was erroneous, which does not amount to reckless disregard.  *See Brawner*, 14 F.4th at 596.

but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" (citation omitted)). Additionally, Wilson did contact the WCRJ provider, who did not believe he was qualified to treat a transitioning patient and told Wilson to contact the pharmacy or the prescribing physician. (Wilson Dep. 135:19-24). At that time, Wilson believed both of these directives had been followed. (Wilson Dep. 137:10-21). Wilson's reliance on another nurse's word that Gonzalez's provider had been contacted is, at worst, negligent and cannot be interpreted as deliberate indifference towards Gonzalez's medical needs. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 892 (6th Cir. 2018) (holding that a nurse was not deliberately indifferent when she acted "based on the information provided to her[,]" even though "hindsight shows that the more prudent approach would have been for [her] to gather additional information about [the inmate's] apparent [opiate] withdrawal."). Therefore, Defendants' motion for summary judgment is granted for the claim against Wilson.

### iv.    Weaver

Weaver argues that she "was not involved in verifying Plaintiff's medications and did not otherwise make any decisions regarding whether or not to provide Plaintiff with any medication." (Defs.' Mem. Supp. Mot. Summ. J. 10). For this reason, Weaver contends that she could not have acted with reckless disregard toward Gonzalez. (Defs.' Mem. Supp. Mot. Summ. J. 10). There is disagreement as to whether Weaver was present for Gonzalez's intake. (Weaver Dep. 18:10-20, 42:17-43:11). Although the medical chart indicates Weaver administered the screening, she claims she did not enter the information— positing that someone else used a laptop for the intake in which her credentials were already signed in. (Weaver Dep. 18:10-20). Weaver believes that all entries in Gonzalez's medical chart from July 22 attributed to Weaver were in fact charted by Wilson mistakenly logged in using Weaver's credentials. (Weaver Dep. 42:17-43:11). Weaver only

recalls treating Gonzalez on July 26 when she checked in on Gonzalez concerning her detox and suicide watch. (Weaver Dep. 29:17-30:1; Gonzalez Medical Chart 60). In contrast, Gonzalez believes Weaver was present for her intake questionnaire. (Gonzalez Dep. 37:11-14, 38:4-7).

Even assuming that Weaver conducted Gonzalez's intake questionnaire, there is no evidence to indicate she acted with reckless disregard towards Gonzalez's medical needs. Weaver confirmed that it is SHP protocol to verify prescriptions with the inmate's pharmacy before a prescription can be ordered. (Weaver Dep. 47:2-5). She also testified that estradiol patches may be a medication that can be continued automatically if the "script was active" and the medication was within "within 30 days of fill". (Weaver Dep. 47:14-48:13). At the time of Gonzalez's intake, her prescriptions had not been verified, and thus Weaver could not have continued administering the estradiol patches on July 22. (*See* Defs.' Mem. Supp. Mot. Summ. J. 2). Regarding Weaver's admitted encounter with Gonzalez on July 26, there is nothing to suggest that Gonzalez asked Weaver for any medications or exhibited behavior other than being "quiet" and "relaxed." (Gonzalez Medical Chart 20-21; Weaver Dep. 43:21-24). Similar to the other Defendants, none of Weaver's conduct arises to the reckless disregard standard required by *Brawner*. *Brawner*, 14 F.4th at 596. The motion, therefore, is also granted for the claim against Weaver.

### c.    Causation

Even if Gonzalez could demonstrate that Defendants acted with deliberate indifference towards her serious medical need, she would still need to provide evidence that Defendants' conduct caused her injury. For the purposes of summary judgment, whether a serious medical need is "readily apparent" or "non-obvious" is an important distinction. *See Phillips v. PTS of Am., LLC*, No. 3:17-CV-603-CHB, 2021 WL 1220997, at *12 (W.D. Ky. Mar. 31, 2021). The

Sixth Circuit has provided guidance on how this distinction relates to a plaintiff's burden of proving causation:

> When a serious medical need is obvious, a plaintiff does not need to provide verifying medical evidence of harm. *Blackmore* [*v. Kalamazoo Cnty.*], 390 F.3d [890,] 899-900 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). But when a serious medical need is not obvious and "is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," plaintiffs must supply medical proof of injury at summary judgment so that we are able "to assess whether the delay [in adequate medical care] caused a serious medical injury."

*Martin v. Warren Cnty.*, 799 F. App'x 329, 338 (6th Cir. 2020) (alteration in original) (quoting *Blackmore*, 390 F.3d at 898). In *Martin*, the administratrix plaintiff argued that the inmate in question did not receive his doses of insulin and prednisone as they were supposed to be administered. *Id.* The court found that because this claim regarded the adequacy of treatment, the plaintiff was required to "provide verifying medical evidence that the treatment [the inmate] received . . . caused him serious medical injury. *Id.* In contrast, the Sixth Circuit in *Blackmore* found that an inmate's medical condition was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention" when the inmate "complained of 'sharp' and 'severe' stomach pains for an extended period of time[,]" vomited, and was placed in an observation cell due to his medical needs. *Blackmore*, 390 F.3d at 899.

The current case is more similar to *Martin*, as it would not be obvious to the layperson that Gonzalez suffered serious injuries caused by her non-receipt of estradiol patches. Gonzalez indicated in her intake that she suffered from back pain and had recently used methamphetamine. (Gonzalez Dep. 35:3-7, 97:20-24; Gonzalez Medical Chart 4). She was placed in an isolated cell for detox and suicide observation. (Gonzalez Medical Chart 60). Gonzalez testified that she experienced an increase in aggression and depression due to her not receiving her medications, and her medical chart indicates she was experiencing pain on July 24. (Gonzalez Dep. 67:18-

68:14; Gonzalez Medical Chart 50).  There is no record in her chart of Gonzalez experiencing pain after this date.  (*See* Gonzalez Medical Chart).  Based upon these facts, this case is clearly distinguishable from *Blackmore*.  Gonzalez did not experience pain over an extended period of time, her placement in an isolated cell was not related to withdrawal from her medications, and the nurses indicated that she was calm and "resting quietly" during the remainder of her incarceration. (Gonzalez Medical Chart 50).  Gonzalez argues that Defendants' "complete lack of treatment" obviates the need for her expert witness to address causation.  (Pl.'s Resp. Defs.' Mot. Summ. J. 16 n.3 (citing *Briggs v. Westcomb*, 801 F. App'x 956, 959-60 (6th Cir. 2020); *Richmond*, 885 F.3d at 939; *Baker v. Jordan*, No. 3:18-CV-471, 2022 WL 17718516 (W.D. Ky. Dec. 15, 2022))).  This point is not well-taken, as Defendants clearly attempted to verify Gonzalez's prescriptions and offered her Tylenol for her pain, which apparently subsided as evidenced by a lack of subsequent incidents after July 24.  (*See* Gonzalez Medical Chart 50).  This does not amount to a "complete lack of treatment."  Therefore, Gonzalez's serious medical need is better classified as "non-obvious" and based on a "failure to treat a condition adequately[,]" which requires Gonzalez to provide causation evidence.  *See Martin*, 799 F. App'x at 338.

Gonzalez has failed to provide causation evidence.  Her expert witness, Edith Wright ("Wright"), is a nurse who explicitly conceded that causation testimony is outside her scope of practice.  (Wright Dep. 45:4-47:20, May 22, 2024, DN 44).  Wright believes she can testify as to the specific side effects one might experience "because of taking or not taking a medication[,]" but admits she cannot state whether "a side effect could be attributed to a medication that [Gonzalez] took or a medication that she didn't have . . ."  (Wright Dep. 45:4-47:20).  Because Gonzalez cannot provide evidence that Defendants' conduct caused her alleged injuries, her Section 1983 claim fails on this ground as well.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.     Defendants' Motion for Summary Judgment (DN 33) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

2.     The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

March 13, 2025

cc:     counsel of record